THE STATE OF OHIO, APPELLEE, v. CREACHBAUM, APPELLANT.

[Cite as State v. Creachbaum (1970), 24 Ohio App. 2d 31.]

(No. 279—Decided August 17, 1970.)

Mr. Roy H. Huffer, Jr., prosecuting attorney, and Mr. Robert Huffer, for appellee.

Messrs. Topper & Alloway and Messrs. Tuttle & Britt, for appellant.

GRAY, P. J. This cause is in this court on appeal on questions of law from a judgment of the Court of Common Pleas of Pickaway County on verdicts of a jury finding defendant guilty on eighteen indictments. Fourteen indictments charged defendant with uttering and delivering a check without sufficient funds or credit. Four counts of the indictments charged defendant with making, drawing, uttering and delivering a check without sufficient funds on credit. The checks were drawn on The National Bank of Sabina, Ohio.

Defendant, feeling aggrieved at the result of his case in the trial court, filed his notice of appeal and assigned the following errors:

"1. The evidence of record is insufficient to establish an intent to defraud.

"2. The admission over objection of incriminating testimony of Joseph Brien as to the statements of Dan Palmer as to what the defendant Creachbaum said was prejudicial.

"3. Cross-examination of character witnesses as to the crimes alleged and as to the reputation of the defendant for a period of time after the crimes alleged is prejudicial.

"4. The charge of the court was erroneous, confusing and prejudicial.

"5. The judgment of the court is against the manifest weight of the evidence, and in the interest of justice, the court should grant the Defendant one new trial."

We will now address ourselves to the assignments of error in the order in which they appear above.

We are of the opinion that the first assignment of error is well taken and that prejudicial error occurred in that regard.

Defendant argues that intent to defraud is an essenial element in the crimes with which he was charged. Defendant further urges that if the New Holland Bank through its chief officer, the President, Robert Kirkpatrick, knew that there was no money in the Sabina Bank to cover the checks he had written, then the element of intent to defraud was lacking and defendant was not guilty of the offenses charged.

The evidence shows Mr. Kirkpatrick knew that "something was going on." Mr. Kirkpatrick testified on direct examination as follows:

"Q. And what are there—was there anything unusual about the checks that were being paid through your bank?

"A. How do you mean unusual?

"Q. The way checks were being paid?

"A. All written to cash. He said for deposit only on the back, that is how he'd write them.

"Q. Where did they come from?

"A. Sabina.

"Q. In what amounts?

"A. Anywhere from eighty-seven thousand on down to twenty-seven thousand maybe.

"Q. Checks similar to the amounts in the 18 you have here?

"A. Yes sir.

"Q. When did you discover that had been going on, Mr. Kirkpatrick?

"A. Well, August or September—in that area.

"Q. August or September of what year?

"A. 1966."

On cross-examination Mr. Kirkpatrick testified as follows:

"Q. And he had written throughout all this period from August on, he had been writing checks back and forth so the account in each bank would be covered, isn't that right?

"A. Yes sir.

"Q. You knew that was going on in August of 1966?

"A. It started about then, yes. That is about when it started. There wasn't anything alarming.

"Q. That is when you started talking about it?

"A. Yes, we wanted to know what he was doing.

"Q. You knew what he was doing because you and Mr. Bernard had discussed it?

"A. I didn't know if he was buying or selling or what he was doing.

"Q. But you knew. You regularly talked with Mr. Bernard and you knew that Mr. Creachbaum was writing checks on your bank in approximately the same amount as these checks that you were shown here, isn't that right, exhibits 1 through 18?

"A. Yes.

"Q. In other words, he was writing checks on your bank and depositing them in the Sabina Bank?

"A. That is about what it amounts to.

"Q. So that really back in August you and Mr. Bernard were aware of these deposits in both banks?

"A. That is right.

"Q. And that if either of you stopped honoring the checks that there would be insufficient funds in the other's account?

"A. Yes, that is true."

Mr. Kirkpatrick testified further that the check kiting scheme of defendant blew up in November 1966 and that

Kirkpatrick then knew that he was "hooked," meaning that defendant could not pay off the bad checks. We quote in part the testimony of Kirkpatrick relative to his knowledge of the state of defendant's bank accounts.

"Q. Can you tell us why you held these checks from February 4 until March 22 and then sent them through?

"A. Because he was going to get the money from his father and mother-in-law.

"Q. Because he was going to get the money but he didn't get it?

"A. No, he didn't get it.

"Q. Why did you send them through—why did you hold them all that time and then send them through?

"A. Because I was—had to get the thing over with, that is all.

"Q. What do you mean you had to get it over with?

"A. This thing—the way—I mean bring it to a head."

Recross Examination by Mr. Britt.

"Q. Just one question. He didn't have to tell you after November you knew it?

"A. Beg your pardon?

"Q. After November, 1966 he didn't have to tell you these checks were no good you knew they were no good?

"A. After they come back all the time, yes.

"Q. Starting with—all 18 of these checks you knew were no good when you got them?

"A. That is right."

By Mr. Britt: "That is all."

Redirect Examination by Mr. Huffer.

"Q. When they kept coming back or when?

"A. When they kept coming back he gave me others to cover those.

"Q. What do you mean by that, did you know the checks were no good when you took them or when they were replaced by others did you think they were good?

"A. I thought they'd be good sometime with the farm and everything else."

Recross Examination by Mr. Britt.

"Q. In fact, you knew those checks were no good when you took them because you knew the farm wasn't sold?
"A. He told me the farm was sold.
"Q. You knew it was not sold during these checks we have been talking about, right?
"A. February, yes."

The answer of the prosecution to this contention is that this was a post dated check and a post dated check not covered with cash can be a violation of the law. See *State* v. *DeNicola,* 163 Ohio St 140.

The question before the court on the first assignment of error is as follows. Does the fact that the President of the New Holland Bank knew that there were insufficient funds in the bank account upon which the check was drawn destroy the criminal intent to defraud? We have answered this question in the positive.

We have searched for a case in point in Ohio and have not found any except that cited in defendant's brief —*State* v. *Vice,* 70 N. E. 2d 125, a Common Pleas Court case written by Judge James Collier. In the opinion he cites the annotation in 95 ALR 486. The editorial comment of the compiler of the cases states at page 494:

"As may be concluded from the reading of the cases set out in the original annotation, with the possible exception of those decided in jurisdictions whose statutes dispense with the element of fraudulent intent, the courts are unanimously agreed, both in the older cases and in more recent decisions, that, under statutes of the type under consideration, disclosure by the drawer to the payee that he has not at the time sufficient funds in the bank to meet the check, purges the transaction of its criminal character, because under such circumstances the element of fraudulent intent is lacking and the transaction in its essential nature is an extension of credit to the drawer."

We have been able to turn up later cases. *State* v. *Eikelberger*, 72 Idaho 245, 239 P. 2d 1069; *Hubbard* v. *Commonwealth*, 201 Va. 61, 109 S. E. 2d 100.

The dates of the checks covered by the 18 indictments are all after January 12, 1967. Kirkpatrick knew for approximately five months prior to the receipt of the checks upon which this indictment is based "what was going on" in defendant's checking account in his bank. For approximately two months Kirkpatrick knew that he was "hooked" as far as the bad checks were concerned.

Therefore, the conclusion must be drawn that there was no intent to defraud the New Holland Bank when it was known by the chief officer of the bank that defendant did not have sufficient funds with which to cover the checks he was presenting to that bank. This legal and factual situation applies to all of the eighteen checks—the subject of the eighteen indictments.

The ledger sheets of the account in the New Holland Bank of Tom L. and Pat Creachbaum from December 31, 1965, until April 24, 1967, were introduced into evidence. Upon examination of the entries previous to August 1966 when Mr. Kirkpatrick first knew of the check kiting scheme by defendant, we observe that on many occasions there were numerous deposits and withdrawals of large sums of money which on a number of occasions resulted in overdrafts.

This is a classic example of check kiting. Check kiting has been defined as a scheme whereby false credit is obtained by the exchange and passing of worthless checks between two banks.

Prejudicial error occurred when defendant failed to prove that defendant made, drew, uttered and delivered the eighteen checks with intent to defraud. Under R. C. 1115.23, it is a crime to issue an uncovered check only if there is an intent to defraud. The fact that funds in an account are insufficient alone will not do.

According to the general view, the payment of an overdraft by a bank amounts to a loan to the depositor. For that reason the amount thereof may be recovered

from the depositor. 7 American Jurisprudence, 422, *Banks,* Section 609. See, also, 9 Corpus Juris Secundum 703, *Banks and Banking,* Section 353. See *Koenig* v. *State,* 121 Ohio St. 147, at 157-158.

It is universally held that where, as here, at the time a check is drawn or delivered to him, the payee has knowledge, or an understanding that it is not then good or collectible, no offense has been committed. This is so because there is then no false representation that the check is good, which is a necessary element of the offense. Intent to defraud is an essential element of the offense covered by R. C. 1115.23. It is the false representation of a past or existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive and does in fact deceive and by means of which one person obtains value from another without compensation. There is no deception on the part of the drawer when the payee knows that there are not sufficient funds in the bank upon which the check is drawn.

We wish to comment on the case of *People* v. *Jacobson* (1929), 248 Mich. 639, 227 N. W. 781. The factual situation is much the same as the one which we have under consideration. The question before the Supreme Court of Michigan was stated thusly. " * * * Is one guilty of violating this statute who at the time he gives the check to the payee informs him that there is not then in the bank funds with which to meet the check, but promises the payee such a deposit will be made within a stated time, followed by failure to make the deposit?"

The statute of the state of Michigan was then much the same as ours is now.

From a reading of the prosecutor's brief it is tacitly admitted that knowledge on the part of the officials of the New Holland Bank that there were insufficient funds in the Sabina Bank or their own bank destroyed the essential element of intent to defraud. The prosecution then advances the theory that because defendant made certain alleged promises that the farm would be sold and there would be sufficient money with which to pay the first mort-

gage to the Federal Land Bank, the second mortgage to the Production Credit Company and the third mortgage to the New Holland Bank, the offense covered by the statute was revivified.

Defendant's promise to make a deposit at some indefinite time in the future was no more than a promise to pay at some indefinite time in the future.

Notwithstanding that under certain circumstances promises made in bad faith as to future conduct may be the basis of a charge of fraud, such is not the offense embodied in this statute.

"Issuing a cheque on an account which has not sufficient funds may be quite an innocent matter. Intent to defraud may be implied from the facts in some cases but in a case such as this it would be dangerous to do so without other proof of such intent. The real issue and crux of the case is the intent to defraud. The onus to prove this is on the Crown." *Rex* v. *Levine* (1922), 3 W. W. R. 429.

The defendant perpetrated no fraud on the New Holland Bank by giving it the checks here in question because the chief officers knew that defendant did not have sufficient funds in or credit with the bank on which it was drawn. The wrong, if any, which was done The New Holland Bank by defendant was not in giving it the checks not covered by sufficient funds, but in failing to comply with his (defendant's) promise to deposit at a later indefinite date sufficient money with the bank to cover the checks.

There is a sharp line between a bona fide intent to meet a check with presently available funds and intent to meet it with funds to be derived from an expected event or transaction.

The fact of the matter is that Kirkpatrick testified that defendant told him that the farm was sold and in another place in the record Kirkpatrick testified that Creachbaum did not tell him that the farm was sold.

Under our theory of the law of this case it was within the knowledge of Kirkpatrick that there were insufficient funds to cover the checks. This destroyed the intent to de-

fraud on the part of defendant. When Kirkpatrick had such knowledge prior to the issuance of the eighteen checks (the basis for the eighteen indictments), there could be no conviction thereon. There was no crime. It was dead. It could not be revitalized by later action on the part of the defendant. What he said later about applying the proceeds of the sale of the farm to the payment of the bad checks could not remove from the mind of Kirkpatrick the knowledge of the fact that there were insufficient funds in the bank to cover defendant's checks. The die had been cast. Such is the theory of the Supreme Court in *State* v. *DeNicola, supra,* when it stated in the second branch of the syllabus as follows:

"The sufficiency of funds or credit is determinable at the time of presentment of a check for payment * * *."

In any event it could not be used as contended by the prosecution, to breathe life into a dead or non-existent offense.

We find prejudicial error occurring in this case as established above. We deem it unnecessary under the circumstances to pass upon the other assignments of error.

On the ground that this record is devoid of proof establishing an intent on the part of the defendant to defraud within the terms of this statute, we must set his conviction aside.

We do not pass on the question of whether defendant violated any other statute or statutes of the State of Ohio and it is not our function to do so. We hold only that on the record in this case defendant was not proven guilty of the crime with which he is charged. Therefore final judgment is entered for defendant.

*Judgment reversed.*

ABELE and STEPHENSON, JJ., concur.