The STATE of Ohio, Appellee,

v.

EDWARDS, Appellant.

[Cite as *State v. Edwards* (2001), 141 Ohio App.3d 388.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 77382.

Decided Feb. 12, 2001.

*William D. Mason,* Cuyahoga County Prosecuting Attorney, and *Hillary Goldberg,* Assistant Prosecuting Attorney, for appellee.

*Michael J. O'Shea,* for appellant.

ANNE L. KILBANE, Judge.

This is an appeal from a judgment of conviction and sentence following a jury trial before Judge Patricia Cleary. Appellant Alfred Edwards, found guilty on three felony counts of passing bad checks (R.C. 2913.11), claims that his Crim.R. 29(A) motion for acquittal should have been granted because (1) the payee knew at the time he presented the checks for payment that the checks would be dishonored, and (2) a dishonored check written for a pre-existing debt cannot constitute a violation of R.C. 2913.11. He also contends that the verdict is against the manifest weight of the evidence and that the sentence imposed is contrary to law. We reverse the judgment denying the Crim.R. 29(A) motion for acquittal and vacate the conviction and sentence.

The record reveals the following. In May 1998, Jeffrey Kolman, a construction manager and general contractor with over thirty years of experience, was hired by Edwards, Chairman and CEO of Triangle Development, Inc. ("Triangle"), to finish construction of two homes on East 81st Street in the Hough neighborhood of Cleveland. Edwards was to pay him $2,000 per month for each house, not to exceed a total of $6,000 per house, and Kolman was to bring in construction crews at a rate of $40 per man hour.

Kolman did not receive his May salary of $2,000 until early July and was told he would receive the rest of the June payment soon but he "didn't press it for a couple of weeks" because he "knew that there were problems."

At the same time Kolman was hired to act as construction manager, Kolman's company, JefKol Construction Services, Inc., in conjunction with Kolman's business associate, John DiMarco, lent Triangle $25,000 for operating expenses, secured by a mortgage on the two properties. The mortgage referenced an accompanying note, and an unsigned copy of a "note contract agreement." Kolman explained that they had agreed upon a twenty-five percent per year interest rate on the loan, but the note was supposed to be only a "two-month note" that was to be paid on August 1, 1998 and was intended "to get [Triangle] over the hump so they could continue on with business." When August arrived and Kolman had not been paid for his June or July work, he began to question what was happening with the funds.

Around October 15, 1998, Edwards gave Kolman three post-dated Triangle checks drawn on a BankOne checking account payable to JefKol and signed by Edwards. According to Kolman, a check dated October 23, 1998, written for $1,650, represented the amount of interest due on the loan at that time; a check dated October 28, 1998, written for $5,800, represented the amount due for his "management and carpentry" services; and a check dated October 28, 1998, written for $25,000 represented the repayment of the loan. In the letter

accompanying the checks, Edwards indicated that they would be made good no later than three to five working days after the dates on the checks. Kolman knew that Edwards did not have the money to cover the checks at the time they were written, and he agreed to hold the checks as requested.

About the same time as this transaction, Edwards wrote the following letter dated October 14, 1998 and issued to both Kolman and Beverly Harris, the owner of Heights Title:

"This is a legal binding document, an instrument to be used by Heights Title that follows a verbal communication that transpired between Triangle Development, Inc. and Heights Title on the closing Escrow issues for 1836 East 81st Street, Bishop and Mrs. Hilton's Home.

"This document serves as protection for JefKol & Associates Construction Co., Inc. that will assure that JefKol & Associates Construction Co., Inc. will be paid in full of the $25,000 loan made to Triangle Development, Inc. for purposes of a liquid line of credit toward construction and overhead.

"In addition to $5,800 due to Jeff Kolman for Management and Carpentry work performed at the 1836 81st Street Site, this will bring the total to be paid in the sum of $30,800. Two (2) checks have been issued to Mr. Kolman, by way of Mr. John DiMarco, Check No. 1147 ($5,800) and Check No. 1148 ($25,000) both dated October 28, 1998.

"We only request that Mr. Kolman check with Mrs. Beverly Harris, Owner of Heights Title[,] to assure her deposit on closing of Heights Title.

"There is nothing that could be said verbally or performed physically that could stop this transaction. The only thing that may change might be a date, plus or minus three to five (3–5) working business days in case of additional due diligence from National City Bank."

Kolman admitted that he knew, within a few days after receiving the checks, that he was supposed to receive payment of the money due him from funds resulting from the closing escrow of the Hiltons' home rather than the checks: "We were to be paid on the 28th and then he [Edwards] changed the rules three days later."

On October 21, 1998, Edwards penned yet another letter, this time to JefKol's attorney:

"I spoke to Beverly Harris, President of Heights Title[,] and it has been confirmed to pay your client out of Escrow and[,] as you are aware, they have been given checks totaling over $32,000. Those checks were put into the hands of John DiMarco.

"* * *

"PS: As your client, John DiMarco, was told <u>before cashing the checks given to him,</u> he must wait until Escrow with Heights Title and the money transfer." (Underlining original.)

Kolman did not deposit the checks on the 28th because, upon speaking with Harris, he learned there were some "continuing problems" with the bank so he waited until November 4, 1998, to deposit them. He admitted that he had doubts about whether the property would close as scheduled but said, "It was difficult to get a straight answer from Triangle Development, so I went and deposited them at that point to see if they were good. I assumed he would make good on his word and the paperwork that he had given me."

He admitted that he had "doubts" that the checks would clear and, therefore, before depositing the checks into a business checking account, Kolman asked for advice on what "recourse" he had when "somebody is stonewalling" him on paying checks. The bank representative told him that he had to deposit them, otherwise he would be unable to pursue a civil claim against Triangle. His bank contacted him a week later, informing him that the three Triangle checks were returned for nonsufficient funds. Kolman said he did not write any checks on JefKol's business account because he "just wanted to make sure that the checks cleared before [he] did anything like that." The bank returned the dishonored checks to him, and he began questioning Edwards about his payment.

Sometime in early December, Kolman claimed that Edwards had told him that Triangle could get some money if Kolman released his mechanic's liens on the Hiltons' property:

"Again, I knew Mr. Edwards and Triangle Development had financial difficulties down there and I, when I did get a chance to talk to Mr. Edwards or Brenda Lewis [President of Triangle], I was assured that I was going to be paid next week or the week after or maybe a couple more weeks, constant assurance that I would be paid. Then they tied it into another attempted closing [of] Bishop Hilton's house, which was to happen around the holidays of 1998. I know it was the Christmas week. And we had Christmas eve and Christmas in there, so some of the banks weren't working, the title companies weren't working, and, you know, things weren't happening, which is not unusual at that time of year.

"I had them sitting in my office at home, and I just sat on those checks until the first week in January when that closing completely fell apart."

On January 4, 1999, utilizing advice he received from the Strongsville Police Department, Kolman sent by certified mail, return receipt requested, a letter formally advising Edwards that the three checks had been returned to him for nonsufficient funds in the Triangle account. He demanded payment in full within ten days and, if not, he would file a formal complaint with the Strongsville Police

Department. The receipt was returned, dated January 5, 1999, and signed "B.J. Mullin," the person identified as Triangle's office manager. When the payment was not forthcoming, Kolman filed charges against Edwards on January 27, 1999.

On March 11, 1999, Edwards was indicted on three felony counts of passing bad checks in violation of R.C. 2913.11. Trial was held on September 28, 1999. At trial Kolman noted that neither of the East 81st homes had yet closed and, while he admitted that the debt could be paid if he foreclosed on the mortgage, he was reluctant to do so because the Hiltons were innocent parties in relation to the grant of the mortgage. Beverly Harris testified about her role as an escrow agent with relation to the Hough property, and a BankOne field operations consultant testified about the activity in the Triangle checking account for the months of September, October, and November 1998. At the close of the state's case, Edwards's lawyer moved for acquittal pursuant to Crim.R. 29, which was denied. In his defense, Edwards offered the testimony of an escrow agent.

The jury returned three guilty verdicts: count 1, passing a bad check in the amount of $1,650, a fifth degree felony; count 2, passing a bad check in the amount of $5,800, a fourth degree felony; and count three, passing a bad check in the amount of $25,000, a fourth degree felony. On October 15, 1999, Edwards filed a motion for judgment of acquittal, which was denied in an order journalized October 25, 1999. On December 6, 1999, Edwards was sentenced to a term of six months' incarceration on each count to run concurrent with each other, court costs, and restitution to Kolman in the amount of $32,450.

Of Edwards's four assignments of error,[1] the first is dispositive of his appeal:

"I. The trial court erred by not granting the motion for judgment of acquittal given the fact the payee of the check knew the check would be dishonored."

Edwards contends that he committed no crimes because Kolman knew (1) that the checks would probably be dishonored, given the fact the checks were post-dated; (2) that he and Triangle had financial difficulties; and (3) that he had been asked to wait until the closing of escrow on the Hiltons' property before seeking reimbursement on his debts. The state counters that nothing in the record shows that Kolman knew that the checks would be dishonored and that the record clearly shows that Edwards wrote the three checks with knowledge that he would not have funds to pay them.

Pursuant to Crim.R. 29(A), a judge "shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." "[A] a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different

---

1. See the Appendix of this opinion for Assignments of Error II through IV.

conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9 O.O.3d 401, 381 N.E.2d 184, syllabus; accord *State v. Cantin* (1999), 132 Ohio App.3d 808, 811, 726 N.E.2d 565, 567–568. When considering whether such evidence is sufficient, a judge views the evidence in a light most favorable to the prosecution. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

R.C. 2913.11(A) provides the three material elements of the crime of passing bad checks and prohibits a person (1) from issuing or transferring, or causing to be issued or transferred, a check or other negotiable instrument; (2) with purpose to defraud the payee; and (3) with knowledge that it will be dishonored.[2] The "with purpose to defraud" element is further defined in R.C. 2913.01(B): " 'Defraud' means to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." In turn, the essential element of "purpose to defraud" also requires a showing that the drawer obtain a "benefit" by "deception" or cause a "detriment" to the payee by "deception."

The Second and Eleventh Appellate Districts have held that the avoidance of paying a debt in a timely manner constitutes a "benefit" for purposes of the definition of "defraud" under R.C. 2913.01(B) as applied to R.C. 2913.11. *State v. Hedrick* (1994), 92 Ohio App.3d 618, 623–624, 636 N.E.2d 428, 431–432; *State v. Doane* (1990), 69 Ohio App.3d 638, 650–651, 591 N.E.2d 735, 743–744; *State v. Jenkins* (Apr. 23, 1999), Lake App. No. 97–L–303, unreported, 1999 WL 310846; see, also, *State v. Lowenstein* (1924), 109 Ohio St. 393, 142 N.E. 897. The Hamilton County Municipal Court has reached a contrary conclusion, holding that, without more, a check tendered for the payment of an antecedent or pre-existing debt that is later found to be worthless cannot constitute the crime of passing a bad check because the creditor is not fraudulently induced to part with property in reliance upon the value of the check and the debt still remains. *State v. Cote* (1991), 62 Ohio Misc.2d 202, 204, 594 N.E.2d 198, 200; *State v. Rudd* (1988), 55 Ohio Misc.2d 1, 2, 562 N.E.2d 955, 956.[3]

---

2. The "knowledge of dishonor" element is further defined in division (B):

"For purposes of this section, a person who issues or transfers a check or other negotiable instrument is presumed to know that it will be dishonored if either of the following occurs:

"(1) The drawer had no account with the drawee at the time of issue or the stated date, whichever is later;

"(2) The check or other negotiable instrument was properly refused payment for insufficient funds upon presentment within thirty days after issue or the stated date, whichever is later, and the liability of the drawer, indorser, or any party who may be liable thereon is not discharged by payment or satisfaction within ten days after receiving notice of dishonor."

3. In *State v. Durbin* (1992), 83 Ohio App.3d 156, 614 N.E.2d 799, the Sixth Appellate District specifically rejected the rule in *Rudd* and adopted the analysis in *Doane*, yet it concluded that

▆ The mere receipt of a benefit is not enough: the state also must show "deception" in the act of obtaining that benefit. "Deception," as used in the definition of "defraud," is defined as follows:

"[K]nowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." (R.C. 2913.01[A].)

▆ Therefore, when the payee knows that a check is not collectible at the time it is tendered, there can be no crime of passing a bad check. *State v. Harris* (1982), 7 Ohio Misc.2d 43, 44, 7 OBR 307, 307–308, 455 N.E.2d 539, 540–541; see, also, *State v. Creachbaum* (1970), 24 Ohio App.2d 31, 38, 53 O.O.2d 117, 121, 263 N.E.2d 675, 679–680, affirmed (1971), 28 Ohio St.2d 116, 119–120, 57 O.O.2d 298, 300–301, 276 N.E.2d 240, 242.

▆ The failure to present sufficient evidence of "intent to defraud" or "knowledge of dishonor" precludes a conviction under R.C. 2913.11. Here, assuming *arguendo* that Edwards received a "benefit" as a result of tendering the worthless checks, there is nothing to show that he did so *as a result of "deception,"* i.e., that Kolman was "deceived" as defined in R.C. 2913.01(A). First, Kolman knew of the precarious financial situation of Triangle in May 1998 when he agreed to provide it with construction management services for the two homes and $25,000 in working capital secured by a mortgage, note, and contract agreement. Second, he knew *before* presenting the checks for payment that a condition was attached to the checks: Edwards intended to satisfy the Triangle debt from the proceeds of the Hiltons' closing escrow; i.e., that the sale of the property must close before the funds due Triangle could be transferred to its checking account, which would then satisfy the terms of the checks. Edwards, apparently relying upon the completion of the Hiltons' purchase escrow, tendered the checks to Kolman. That closing was supposed to occur on a date certain and Kolman knew it was tied up in other issues. Finally, despite Kolman's admitted doubts over whether that property escrow would close or whether the checks would, in fact, be honored by BankOne upon presentment, he *chose* to deposit the checks, based upon the advice of his own financial institution. He deposited the checks in an effort to ensure his right to collect the full amount of the debt

---

the state failed to show an intent to defraud because Durbin gained no advantage when he issued worthless checks to his ex-wife in satisfaction of their judgment of divorce (on an account he allegedly used to kite checks), since the debt still remained and he was subject to contempt proceedings for failing to pay the debt.

against Edwards in a subsequent civil suit. The state failed to show that Kolman was deceived and, therefore, failed to present sufficient evidence of an "intent to defraud" to satisfy a material element of R.C. 2913.11. Edwards's poor business practices, in the present case, did not constitute the crime of passing bad checks. This assignment of error has merit.

We need not address the remaining assignment of error pursuant to App.R. 12.

The ruling on the October 15, 1999 motion for judgment of acquittal is reversed, and the conviction and sentence are vacated.

*Judgment accordingly.*

ANN DYKE and COLLEEN CONWAY COONEY, JJ., concur.

## APPENDIX

### Assignment of Error No. II

"The trial court erred by not granting the motion for judgment of acquittal given the fact that checks in question were payment for an antecedent debt."

### Assignment of Error No. III

"The verdict is against the manifest weight of the evidence given the fact that the evidence showed that the debt was to be paid through the closing of a home sale."

### Assignment of Error No. IV

"The sentence of the appellant is contrary to law."