OPINION
{¶ 1} Defendant-appellant, Christopher Wamsley, appeals his conviction and sentence on 12 counts of passing bad checks following a bench trial in the Butler County Court of Common Pleas.
 {¶ 2} Appellant worked eight years for his father's trucking business, SOS Transport Inc. ("SOST"). The company acted as an intermediary, employing truck drivers to haul loads for Ford Motor Company doing business as Visteon. Truck drivers would haul loads directly for Visteon, then turn over their shipping orders and delivery receipts to SOST. The company, in turn, would collect the drivers' fees from Visteon, keep a percentage of the fees, pay the drivers' insurance, and then pay the remainder to the drivers. Gene Halcomb, who ran a family-owned trucking business and who started working for SOST in 1992, was one such driver. Every day, his wife June would fax to SOST a description of what their business had hauled. Every Friday, June would take the shipping orders and delivery receipts to SOST where she would receive a check for the bills turned in.
 {¶ 3} SOST went out of business in December 2000. In January 2001, appellant started a new company, Wamsley Enterprises, Inc., doing business as Majesty Transportation. Appellant started the new company with an initial deposit of $50,000 into a National City Bank account. In January 2001, there were additional deposits into the bank account of about $180,000. Because Wamsley Enterprises was a start-up company, appellant could not obtain conventional financing through a bank. Instead, he used a factoring company, Oxford Capital. Wamsley Enterprises would fax or send overnight bills as generated by sales to Oxford Capital. The factoring company, in turn, would wire to Wamsley Enterprises' bank account 85% of the money due on the bills. The entire process would take about two days. Wamsley Enterprises would write checks to pay drivers from its bank account at National City Bank.
 {¶ 4} Wamsley Enterprises was to be operated in the exact same way SOST was. In a letter sent to Gene and other drivers in December 2000, appellant stated that "[b]y January 1, 2001 we will have completed the transition from SOS Transport Inc. to Wamsley Enterprises Inc." The letter asked the drivers to come work for the new company and promised that "if anything occurs to cause you difficulty or loss during this period for any reason, you have my commitment to do whatever I have to in order to make things right. I give you my word that if each of you will stand with me and give me your best 100% through this start-up phase of Wamsley Enterprises Inc. I will build a company that genuinely cares about you and your families."
 {¶ 5} Although Wamsley Enterprises was a completely different company than SOST, Gene and other drivers were led to believe that it was merely a name change. Gene was also told by appellant that everything else would be the same and that any money owed by SOST would be carried over and paid by Wamsley Enterprises. One of the debts SOST owed when it went out of business was to Gene's company for checks previously issued by SOST. The checks, which amounted to $36,429 and were in payment of work performed by Gene and his company in 2000, were dishonored in December 2000.
 {¶ 6} Following the demise of SOST, Gene's company went to work for Wamsley Enterprises. On January 12, 2001, Gene talked to appellant about the bad checks he had received from SOST. By that time, Wamsley Enterprises owed Gene's company money for that week's work. Appellant promised to pay the SOST debt. Because he was having financial problems, appellant asked Gene not to turn in the week's paperwork, but rather, to turn it in the following week along with that week's paperwork. On January 19, 2001, June brought the paperwork to Wamsley Enterprises. That afternoon, she received 12 checks signed by appellant, including one for the $36,429 debt owed by SOST. Appellant asked June to wait until the following Monday (January 22, 2001) at 1:00 p.m. to cash them. June understood appellant's request to mean that the money was not in the bank on January 19, 2001. She, however, expected the money to be there on January 22.
 {¶ 7} June did as she was asked. On Monday, she called National City Bank at 1:00 p.m., and again at 2:00 p.m. and 4:00 p.m. Each time, she was told that the money was not there. The Halcombs also tried to take the checks to their bank; however, their bank would not accept the checks because of its prior experience with SOST. The Halcombs then brought the checks to two branches of National City Bank but neither branch would accept the checks. Unable to cash the checks, June called appellant several times over the next two to three weeks. Every time, appellant would tell her that he was waiting for Oxford Capital to wire money to National City Bank. June kept trying to cash the checks but there was never enough money in the account to cash them. The Halcombs' bank eventually allowed them to deposit the checks in their bank account. On January 31, 2001, 11 checks were returned stamped "insufficient funds" by National City Bank. The $36,429 check was also returned; Wamsley Enterprises had put a stop payment order on it.
 {¶ 8} Based upon appellant's assurance that Gene and his employees would be paid, and because it takes a while to change companies, Gene worked for Wamsley Enterprises the week of January 22, 2001. However, concerned that they may not be paid for that week as well, Gene refused to turn the paperwork, worth about $40,000, for a while. The stop payment order was appellant's response to Gene's refusal to turn in the paperwork. Gene eventually turned in the paperwork and got paid for that work. However, instead of receiving a check from appellant, Gene was paid directly by Oxford Capital. Gene and his employees eventually stopped working for Wamsley Enterprises.
 {¶ 9} The 12 checks issued on January 19, 2001 and worth about $90,000 were never paid. Autumn Longoria who worked for SOST first, and then Wamsley Enterprises, testified that her main function, while working for Wamsley Enterprises, was to reimburse people for bad checks. In addition to paying the drivers for their work for Wamsley Enterprises, appellant was also paying debts from SOST, so that the drivers would continue working for his company. Like Gene's checks, checks issued to other drivers were not good and were returned for insufficient funds. In fact, Longoria would call National City Bank several times a day to inquire about the balance of the company's account. Except for one instance when the bank account had a balance of about $100, there was never a positive balance in the bank account. There were simply never enough funds in the account to cover the checks issued to the Halcombs.
 {¶ 10} The Halcombs eventually contacted Detective Michael Staples of the Monroe Police Department. Early in February 2001, the detective called appellant and told him about the Halcombs' dishonored checks. Appellant told the detective he knew the checks were not good when they were issued but that he was trying to keep the Halcombs on as employees. Appellant then agreed to start paying the Halcombs $8,000 a week and to notify them of his intention to do so. He never did. The detective again called appellant who told him it was going to be taken care of. It never was. Wamsley Enterprises went out of business in March 2001.
 {¶ 11} Appellant was originally indicted in May 2001 on 14 counts of passing bad checks in violation of R.C. 2913.11(A), all fourth or fifth degree felonies. However, because the checks involved in counts 13 and 14 were made good at some point, the state agreed to dismiss those two counts. Following a bench trial on the remaining 12 counts, the trial court found appellant guilty as charged. The trial court sentenced appellant to five years of community control and ordered him to pay restitution in full. The trial court accepted appellant's restitution plan to pay $30,000 to the Halcombs on the day of sentencing, and to pay the balance in 60 monthly payments at the rate of $1,000 per month. The $30,000, which was paid immediately by appellant, was offered in mitigation of his sentence and was accepted as a mitigating factor by the trial court in placing appellant on community control. Appellant now appeals, raising three assignments of error.
 {¶ 12} In his first assignment of error, appellant argues that the trial court erred by overruling his Crim.R. 29(A) motion for acquittal at the close of the state's case. Appellant argues that the state failed to show beyond a reasonable doubt that he issued the checks to the Halcombs with an intent to defraud.
 {¶ 13} Under Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. State v. Bridgeman
(1978), 55 Ohio St.2d 261, syllabus. When reviewing the sufficiency of the evidence to support a criminal conviction, "[a]n appellate court's function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 14} Appellant was convicted of passing bad checks in violation of R.C. 2913.11(A), which states that "[n]o person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored." A person who issues a check "is presumed to know that it will be dishonored if * * * [t]he check * * * was properly refused payment for insufficient funds upon presentment within thirty days after issue * * *, and the liability of the drawer * * * is not discharged by payment or satisfaction within ten days after receiving notice of dishonor." R.C. 2913.11(B)(2).
 {¶ 15} "Defraud" means "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." R.C. 2913.01(B). "Deception" in turn is defined as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A).
 {¶ 16} Appellant contends that there was no evidence of intent to defraud because the Halcombs knew there were insufficient funds in the Wamsley Enterprises' bank account at the time the checks were issued. In support of his contention, appellant cites State v. Creachbaum (1970),24 Ohio App.2d 31, which held that "where, as here, at the time a check is drawn or delivered to him, the payee has knowledge, or an understanding that it is not then good or collectible, no offense has been committed. This is so because there is then no false representation that the check is good[.]" Id. at 37; see, also, State v. Edwards
(2001), 141 Ohio App.3d 388; State v. Harris (M.C. 1982),7 Ohio Misc.2d 43; and State v. Vice (C.P. 1946), 33 O.O. 544. In so holding, Creachbaum defined intent to defraud as "the false representation of a past or existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive and does in fact deceive and by means of which one person obtains value from another without compensation." Creachbaum, 24 Ohio App.2d at 37.
 {¶ 17} While we recognize that several Ohio courts have held that way, we are nevertheless troubled by the result it automatically achieves. Indeed, this holding gives a drawer a blank check, so to speak, to avoid being convicted for passing bad checks by simply telling or indicating to the payee, at the time the check is issued or drawn, that it is then not good or collectible, and thereafter by never making the check good. This holding goes against "the evident purpose of [the] statute to prevent the negotiation of false checks drawn on accounts which did not exist, or were insufficient to pay the checks drawn." Statev. Lowenstein (1924), 109 Ohio St. 393, 402.
 {¶ 18} Intent is a question of fact and not of law, Koenig v.State (1929), 121 Ohio St. 147, 151, to be determined from all the facts and circumstances as shown by the evidence. State v. Johnson (1978),56 Ohio St.2d 35, 38. For appellant's claim of insufficient evidence to be well-taken, the record, when viewed in a light most favorable to the prosecution, must fail to contain probative evidence and reasonable inferences that can be drawn therefrom which could persuade a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. State v.Valentine (July 18, 1988), Butler App. No. CA87-07-091, at 4.
 {¶ 19} Evidence in the state's case-in-chief revealed that while June understood there was no money to cover the checks on January 19, 2001, she fully expected them to be paid on January 22, 2001 at 1:00 p.m. Prior to January 19, 2001, appellant kept assuring Gene that the $36,429 debt from SOST as well as Gene's two weeks of work for Wamsley Enterprises would be paid by Wamsley Enterprises. See State v. Olsen
(Dec. 20, 1984), Cuyahoga App. No. 48200. Evidence also revealed that despite appellant's assurances, Wamsley Enterprises was experiencing financial difficulties as a result of paying SOST debts. Wamsley Enterprises was paying those debts to entice drivers to continue working for appellant's company. As previously noted, although SOST and Wamsley Enterprises were two different companies, Gene and other drivers were led to believe that the change only involved a name change. Longoria testified that her main function while working for Wamsley Enterprises was to reimburse people for bad checks. Appellant's promise to pay SOST debts to keep drivers affected the bank balance on each succeeding business day, resulting in the checks issued to Gene, along with checks issued to other drivers, to be returned for insufficient funds. Despite appellant's assurance to Gene that he would be paid, the bank account never had enough money to cover the checks issued to Gene. Yet appellant kept failing to deposit adequate funds in the bank account to cover the checks.
 {¶ 20} "To conclusively negate an intent to defraud on this factual predicate, would require * * * to ignore substantial gaps in an exercise of logic." State v. Marshall (Apr. 5, 1991), Lake App. No. 89-L-14-159. In light of the definitions of "intent to defraud" inCreachbaum and "deception" in R.C 2913.01(A), we find that there was sufficient evidence for the trial court to find an intent to defraud on the part of appellant regarding the 12 checks issued to Gene on January 19, 2001.
 {¶ 21} Appellant also argues that he should have been acquitted at the close of the state's case regarding the $36,429 check because there was no disadvantage to the Halcombs and no advantage to himself as "the Halcombs had already agreed to work for him and needed to continue to work for him for their own economic necessity."
 {¶ 22} It is well-established that the mere fact that a worthless check is given for a past consideration does not, ipso facto, relieve the drawer of the bad check from the criminal offense of passing bad checks under R.C. 2913.11. See Lowenstein, 109 Ohio St. 393; State v. Doane
(1990), 69 Ohio App.3d 638.
 {¶ 23} We disagree with appellant's claim that by issuing the check, he received no advantage and that there was no disadvantage to the Halcombs. As a general rule, when a bad check is written for a pre-existing debt, the issuer of the check certainly receives a benefit from the issuing of that check by avoiding harassment by the creditor, at least for a little while, and by avoiding legal proceedings, at least for a little while. See State v. Hedrick (1994), 92 Ohio App.3d 618. The issuer of the bad check expects "to deceive persons who are pressing for payment; he expects them to think that he has paid the old debt when he has not paid." Lowenstein, 109 Ohio St. at 401. Appellant certainly received those benefits in the case at bar.
 {¶ 24} Contrary to appellant's assertion, the Halcombs also received a disadvantage even though they were already working for him. It can be inferred from the record that the Halcombs continued to work for appellant in his new company after the demise of SOST at least in part because they were led to believe that the new company only involved a name change. While they were already working for appellant when they were issued the $36,429 check, evidence also showed that they held off leaving appellant's company for a couple of weeks in the hopes that things would get straightened out and that they would be paid for the SOST debt. When it became clear that they were not going to be paid, they left appellant's company. In addition, the Halcombs certainly lost the benefit of having possession of the $36,429 during the period in which the debt remained unpaid.
 {¶ 25} In light of all of the foregoing, we find that the trial court did not err by denying appellant's Crim.R. 29(A) motion regarding the 12 checks issued to the Halcombs on January 19, 2001. There certainly was sufficient evidence at the close of the state's case to find appellant guilty of passing bad checks in violation of R.C. 2913.11(A). Appellant's first assignment of error is overruled.
 {¶ 26} In his second assignment of error, appellant argues that his conviction was against the manifest weight of the evidence. Once again, appellant argues that the state failed to establish beyond a reasonable doubt that he issued the 12 checks to the Halcombs with an intent to defraud. Once again, appellant argues that he should not have been convicted with regard to the $36,429 check when he received no benefit and the Halcombs suffered no detriment as a result of the subsequent dishonor of the check.
 {¶ 27} In order for a court of appeals to reverse a trial court's judgment on the basis that a verdict is against the manifest weight of the evidence, the appellate court must disagree with the resolution of conflicting testimony at the trial level. State v. Gipson (Apr. 6, 1998), Warren App. No. CA97-07-080, at 8. "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 28} Following the close of the state's case, appellant testified on his own behalf. The Halcombs were already working for appellant's new company when they asked him about the bad checks they had received from SOST. Appellant told them he would try to make those checks good but that he needed them to continue to do business with Wamsley Enterprises in order to generate revenue. Appellant needed the Halcombs to continue to generate revenue until he could get other financing in place. Appellant testified that he had explained to them on several occasions how the process with a factoring company worked. When he gave the checks to June on January 19, 2001, a Friday, "it was already after five o'clock so she couldn't do anything with the checks that day anyway." Appellant told June that some time after 1:00 p.m. on Monday a wire transfer from Oxford Capital should be in the company's bank account. At the time he issued the checks to June, appellant did not know how much money was in the bank account. He knew, however, that the account did not have the amount needed to cover the checks.
 {¶ 29} Appellant expected the checks to be honored on January 22, 2001. His expectation was based upon his working relationship with the Springboro branch manager of National City Bank, Lori Hammond. According to appellant, Hammond, knowing that funds would be wired into the account from Oxford Capital, would allow the account to be overdrawn and would honor checks even though the account was overdrawn. Bank records for the months of January, February, and March 2001, however, showed numerous returned check charges, as well as overdraft charges (at $26 a charge).
 {¶ 30} The checks were never honored. Appellant explained that based upon his relationship with Hammond, had the Halcombs deposited the checks instead of wanting to cash them, the checks would have been honored. However, when the Halcombs ultimately deposited the checks, they were nevertheless dishonored. Appellant admitted that the money generated by the Halcombs' work for the weeks of January 12 and 19, 2001 was wired into the account but that it was absorbed by other checks written on the account. Appellant admitted that he was paying out money (for payrolls and SOST debts) that exceeded the company's income. Yet, some checks, albeit not the checks issued to the Halcombs, were clearing.
 {¶ 31} With regard to the $36,429 check, appellant testified that he agreed to pay it out of a moral obligation and that he expected it to be honored. When the Halcombs refused to turn in the paperwork, resulting in a loss of revenue for appellant's company, and in breach of their agreement that appellant would pay the debt as long as the Halcombs would continue working and generate revenue, appellant no longer felt obliged to honor the check and put a stop payment order on it. Appellant denied trying to defraud the Halcombs. Appellant noted how, with the exception of the checks issued to the Halcombs, all the other checks issued by Wamsley Enterprises had been made good.
 {¶ 32} Upon thoroughly reviewing the record, and incorporating our treatment of appellant's argument regarding intent to defraud in his first assignment of error under this assignment of error, we find that the trial court did not err by finding intent to defraud on the part of appellant. With regard to appellant's argument regarding the $36,429 check, we find that it has already been considered under appellant's first assignment of error. We find that the evidence presented during appellant's testimony at trial does not change our previous holding that the Halcombs suffered a detriment and that appellant received a benefit. We therefore incorporate our treatment of appellant's previous argument under this assignment of error.
 {¶ 33} In accordance with the standard of review articulated above, we find that appellant's conviction for passing bad checks was not against the manifest weight of the evidence. Appellant's second assignment of error is overruled.
 {¶ 34} In his third assignment of error, appellant argues that the trial court erred by ordering him to pay restitution for the $36,429 check. Once again, appellant contends that the Halcombs suffered no economic loss as a result of the issuance of the check.
 {¶ 35} R.C. 2929.18(A)(1) grants a trial court the authority to order restitution for a felony "in an amount based on the victim's economic loss." R.C. 2929.01(M) defines "economic loss" as "any economic detriment suffered by a victim as a result of the commission of a felony[.]" We find that the Halcombs suffered economic loss as a result of appellant's issuance of the dishonored and never-paid check. In addition, we note that at the very beginning of the sentencing hearing and before the trial court had ordered any restitution, appellant himself offered a restitution plan to pay $30,000 at the sentencing hearing and the balance in 60 monthly payments. After the Halcombs agreed to his offer, the trial court accepted appellant's plan and used it as a mitigating factor in placing appellant on community control. Appellant's third assignment of error is accordingly overruled.
Judgment affirmed.
YOUNG and POWELL, JJ., concur.