OPINION
{¶ 1} Antwyn J. Boyd was found guilty of one count of passing bad checks by a jury in the Montgomery County Court of Common Pleas and was sentenced to six months of imprisonment. He appeals from his conviction.
 {¶ 2} The state's evidence established the following facts.
 {¶ 3} On November 12, 2001, Boyd entered into a contract with ManaVision, Inc., a communication and marketing company owned by Maureen Manavis, pursuant to which ManaVision was to create an educational C.D. about Martin Luther King, Jr. according to Boyd's specifications. The contract provided for a total price of over $21,000 which was to be paid in three installments. The first installment of $7,155 was due up front. Although Boyd did not immediately tender payment, ManaVision began work on the project. After ManaVision made repeated inquiries regarding the first payment, Boyd delivered a check to the ManaVision office on the afternoon of Friday, December 7, 2001.
 {¶ 4} Boyd handed the check to Marne Nemitz, the project manager for ManaVision, and told her to have Manavis call him about the check. The check itself was undated, and Nemitz noticed that the named of Boyd's company was misspelled. Nemitz telephoned Manavis and told her that Boyd had delivered a check and that he had requested that Manavis call him regarding the check. Manavis testified that she had understood that there was some problem with the check and had not taken any action until the following Monday. On Monday, December 10, 2001, Manavis called National City Bank and asked if there were sufficient funds in the account identified on the check. Upon discovering that the account had been closed, Manavis called Boyd. He informed her that he knew that the account had been closed but that he was working with the bank to get it reopened. At this point, Manavis informed Boyd that he needed to deliver a cashier's check to cover the first payment.
 {¶ 5} When Boyd failed to deliver payment by the next day, Manavis contacted the police. Detective Jeffery Yount of the Oakwood Police Department was assigned to the case. Upon his instruction, Manavis waited three more days to determine whether Boyd would tender payment for the amount of the check. When he did not, Manavis again contacted Detective Yount, who then contacted Boyd. Boyd informed Detective Yount that Manavis knew that the check was not good and that he had instructed ManaVision to hold the check while he worked with the bank to get the account reopened. When Detective Yount stated that he had never seen a bank reopen an account under these circumstances, Boyd admitted that it was unlikely that the account would be reopened and stated that he was trying to get money from an investor. Although Boyd told Detective Yount that he would make payment by December 17, 2001, he did not, and he did not contact Detective Yount again.
 {¶ 6} On February 27, 2002, the Montgomery County Grand Jury indicted Boyd on one count of passing bad checks in violation of R.C.2913.11(A). On March 12, 2002, Boyd attempted to tender a cashier's check to ManaVision, but it was refused. After some negotiation regarding whether ManaVision was still in possession of some of Boyd's property, Manavision accepted the cashier's check, and Boyd signed a release. On July 1 and 2, 2002, Boyd was tried by a jury, which found him guilty of passing bad checks. He was sentenced to six months of imprisonment.
 {¶ 7} Boyd raises one assignment of error.
 {¶ 8} "I. The trial court erred by not granting appellant's Rule 29 motion for acquittal since the state failed to provide sufficient evidence as to all the necessary elements of the charge of passing a bad check and the conviction is also against the manifest weight of the evidence."
 {¶ 9} Boyd argues that the trial court should have granted his Crim.R. 29 motion because the state had failed to present sufficient evidence to support his conviction for passing bad checks. He further argues that his conviction was against the manifest weight of the evidence.
 {¶ 10} In reviewing a challenge to the sufficiency of the evidence, we must determine whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the state had proven the essential elements of the crime beyond a reasonable doubt. See State v. Jenks (1991), 61 Ohio St.3d 259,273, 574 N.E.2d 492. When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins (1997), 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 175.
 {¶ 11} Boyd was charged with passing bad checks. R.C. 2913.11(A) provides: "No person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored." Knowledge of dishonor is presumed where the drawer has no account with the drawee on the date the check is issued or the date on the check, whichever is later. R.C.2913.11(B). Boyd argues that the state did not present sufficient evidence that he had issued the check "with purpose to defraud" because Nemitz and Manavis at ManaVision knew that the check could not be cashed. He cites to State v. Creachbaum (1970), 24 Ohio App.2d 31,36-37, 263 N.E.2d 675, and State v. Edwards (2001), 141 Ohio App.3d 388,395, 751 N.E.2d 510, in support of this argument.
 {¶ 12} The definition of "defraud" is "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." R.C. 2913.01(B). "Deception" is defined by statute as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C.2913.01(A).
 {¶ 13} In Creachbaum, the Fourth District Court of Appeals held that there was no intent to defraud where the chief officer of the bank knew that the defendant did not have sufficient funds in his account to cover the checks he was writing. Creachbaum, supra, at 36-37. The court stated:
 {¶ 14} "It is universally held that where, as here, at the time a check is drawn or delivered to him, the payee has knowledge, or an understanding that it is not then good or collectible, no offense has been committed. This is so because there is then no false representation that the check is good, which is a necessary element of the offense. Intent to defraud is an essential element of the offense covered by R.C.1115.23 [the comparable statute to current R.C. 2913.11]. It is the false representation of a past or existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive and does in fact deceive and by means of which one person obtains value from another without compensation. There is no deception on the part of the drawer when the payee knows that there are not sufficient funds in the bank upon which the check is drawn." Id. at 37.
 {¶ 15} In Edwards, the Eighth District Court of Appeals likewise held that there is no intent to defraud when the payee knows that the check is not good. Edwards, supra, at 395. "The state failed to show that [the victim] was deceived and, therefore, failed to present sufficient evidence of an `intent to defraud' to satisfy a material element of R.C.2913.11. [Defendant's] poor business practices, in the present case, did not constitute the crime of passing bad checks." Id.
 {¶ 16} In the instant case, we also must conclude that the state failed to present sufficient evidence of a purpose to defraud. The state argues that at least Edwards is factually distinguishable because the defendant in that case informed the payee that the check was not good. It further argues that there is no evidence in this case that anyone at ManaVision knew the check was bad. First, we believe that the principles espoused in Creachbaum and Edwards are applicable to this case, despite the fact that Boyd could have been more explicit in telling Nemitz and Manavis that the check was not good. At least in Creachbaum, there is no evidence that the defendant informed the payee that the check was not good. Rather, the payee knew there were insufficient funds in the account when he accepted the check. Thus, Creachbaum focuses on the understanding of the payee rather than the steps taken by the defendant to inform the payee of the status of the check. In any case, Boyd did take steps to inform ManaVision that the check would not be honored. He did not date the check, and he instructed Nemitz to have Manavis call him regarding the check.
 {¶ 17} Second, the evidence, taken in the light most favorable to the state, does establish that at least Manavis understood the check to be bad. The facts presented by the state establish that Boyd gave Nemitz a check that was undated and instructed Nemitz to have Manavis call him about the check. Although Nemitz testified that she had had no understanding that the check was not good, Manavis did reach such a conclusion. Manavis testified that she had "assumed" and "understood" that the check would not be honored given that Boyd had instructed her to call him about it. This understanding is further illustrated by the fact that Manavis called the bank before attempting to cash the check. Given these facts — Boyd informed Manavis through Nemitz that she should call him about the check, Boyd did not date the check, and Manavis did in fact understand the check to be bad — the state did not establish that Boyd had had the requisite purpose to defraud ManaVision. On the contrary, it appears that Boyd took steps to inform ManaVision that the check would not be honored. The fact that Boyd could certainly have been more explicit in his instructions to Nemitz, without more, does not prove that he had a purpose to defraud ManaVision. Thus, while Boyd certainly owed ManaVision money and may have been liable for breach of contract, there was insufficient evidence of the crime of passing bad checks.
 {¶ 18} Boyd's assignment of error is sustained.
 {¶ 19} The judgment of the trial court will be reversed, and Boyd will be discharged.
BROGAN, J. and YOUNG, J., concur.